UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM STEVERS,

Plaintiff,

v.

GROUNDWORKS OPERATIONS, LLC,

Defendant.
_______________________________/

Case No. 1:25-cv-791

Hon. Hala Y. Jarbou

**OPINION**

Plaintiff William Stevers brings this lawsuit against his former employer, Groundworks Operations, LLC, alleging age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq*.[1] Before the Court is Groundworks' motion for summary judgment (ECF No. 33). For the reasons explained below, the Court finds that Stevers has failed to establish a genuine dispute of fact as to whether he was discriminated against based on age. Thus, it will grant Groundworks' motion and dismiss Stevers's case.

## I. BACKGROUND

Stevers's claim is centered on Groundworks' termination of him in 2022, when he was 59. (*See* Stevers Dep. 9, ECF No. 34-2.) Groundworks is a business that provides "foundation repair, basement waterproofing, crawlspace encapsulation, concrete repair, and concrete lifting services." (Weeden Decl. ¶ 4, ECF No. 34-1.) Stevers began working at Groundworks in early 2020, when it acquired his previous employer, Foundation Systems of Michigan. (Stevers Dep. 43.) Stevers

[1] Stevers initially also brought weight and height discrimination claims under the ELCRA, but he stipulated to their dismissal in his response to Groundworks' motion for summary judgment. (Pl.'s Resp. 13 n. 7, ECF No. 35.)

served as operations manager of Groundworks' Traverse City branch. (*Id.* at 44.) He had a variety of other duties, including "sales manager," "service manager," and "warehouse manager." (*Id.*) He was the most senior employee at the Traverse City location, and initially managed about 28 employees. (*Id.*) Although other Groundworks branches were run by general managers, Traverse City had only an operations manager due to its smaller size. (*See* Martin Decl. ¶ 4, ECF No. 34-3.)

On July 2, 2021, Stevers terminated employee Will Irvine without consulting the human resources department, which violated company policy. (Weeden Decl. ¶ 9.) Stevers claimed at the time that Irvine had been "insubordinate, argumentative, and explosive," and was "shouting and swearing." (*Id.* ¶ 10 (cleaned up); *see* Personnel Action Form, ECF No. 35-5.) According to Stevers's testimony, Irvine had become upset about his work assignments and "[s]tarted yelling and swearing." (Stevers Dep. 93.) Irvine walked away and began shouting and arguing with himself; he told others to "get away from [him]" and said, "This is bull****." (*Id.* at 94.) He then "started slamming things around" and "throwing things in his truck." (*Id.* at 95.) Stevers "was very calm" the whole time and did not raise his voice or get close to Irvine, but he told Irvine he was terminated. (*Id.* at 95–96, 108.)

After Irvine's termination, Will Weeden from human resources looked into the matter. Stevers referred Weeden to several witnesses—warehouse manager Charles Shaw, production manager Thomas McCoy, and production manager David Dean—who submitted statements. (Weeden Decl. ¶ 11.) The statements broadly corroborated Stevers's account. (*See* McCoy Statement, ECF No. 35-6; Dean Statement, ECF No. 35-7; Shaw Statement, ECF No. 35-8.) However, Irvine told Weeden a different version of events: Stevers had "bec[o]me agitated, raising his voice, and yelling in Mr. Irvine's face." (Weeden Decl. ¶ 12.) Irvine also said that Stevers had

previously behaved in an "aggressive and bullying" manner, and provided the names of other employees who could confirm that fact. (*Id.*)

Weeden spoke to the people identified by Irvine, "and those individuals stated that Mr. Stevers had been rude to them, yelled at them, and created a hostile work environment with his aggressive behavior." (*Id.* ¶ 13.) One employee said they had "witnessed several aggressive interactions between Mr. Stevers and Mr. Irvine and felt Mr. Stevers made Mr. Irvine's work experience very unpleasant." (*Id.*) Ultimately, Groundworks did not take any action against Stevers regarding this incident. However, when Angelita Tolliver joined the human resources department in October of 2021, Weeden told her about the reports he had received regarding Stevers's conduct. (*Id.* ¶ 17; Tolliver Decl. ¶ 5, ECF No. 34-7.)

In April of 2022, Jeff White became regional manager and Stevers's direct supervisor. (White Decl. ¶¶ 3, 5, ECF No. 34-4.) According to White, he quickly "began hearing about issues relating to Mr. Stevers's treatment of other employees." (*Id.* ¶ 6.) Clayton Shepard, an employee working under Stevers, "spoke to [White] in tears and complained . . . that Mr. Stevers yelled at and belittled him for being late to work." (*Id.*) White addressed the issue with Stevers, who "brushed off [his] concern" and said that Shepard was just "emotional." (*Id.* ¶ 7.) Around this time, White also received a complaint from Theresa Grist, the officer manager, who accused Stevers of "unprofessional and bullying conduct during a sales meeting." (*Id.* ¶ 9.) Specifically, Grist claimed that Stevers had "lean[ed] over and yell[ed] at Bill Stone," an employee under his supervision, and "poke[d] Mr. Stone in the chest." (*Id.*) At his deposition, Stevers testified that he had briefly raised his voice at Stone but remained "professional" and did not lean over or poke Stone. (Stevers Dep. 140–41.)

On July 14, 2022, Stevers conducted a sales meeting from which two employees were absent: Clayton Shepard and Chris Bohnett. (*Id.* at 129–30.) After the meeting, the workday ended and Stevers headed to the parking lot, where he found Shepard and Bohnett sitting in a company van with the engine running. (*See id.* at 130–32.) Stevers thought their behavior was odd because "[t]here was really no reason to be sitting in the van" and "[p]rocedure would be to come in and unload and then punch out when you're done working." (*Id.* at 132.) Stevers drove up to the van and asked Bohnett and Shepard what they were doing. (*Id.* at 145.) Shepard responded that they were waiting for a ride; Stevers asked him if they had clocked out yet, and Shepard said they had not. (*Id.* at 145–46.) Stevers did not understand why they would still be on the clock while waiting for a ride. (*See id.*)

Stevers told Bohnett and Shepard to park the van and clock out. (*Id.* at 147.) Shepard told Stevers, "you're not my boss," and Stevers responded that he was Shepard's boss. (*Id.*) Shepard said he was going to call Jeff White, the regional manager, and Stevers told him that he was suspended. (*Id.* at 149.) Stevers testified that during this entire exchange, he did not yell, though he may have raised his voice slightly because Shepard "was not listening." (*Id.* at 155.) He also stated that he has "a hearing problem" and sometimes "talk[s] louder than normal." (*Id.*)

After the incident, Shepard called White and was "hysterical, crying, and extremely upset." (White Decl. ¶ 11.) Shepard told White that Stevers had yelled at him and suspended him, and that Shepard "was thinking about quitting rather than continuing to work under Mr. Stevers's tyranny." (*Id.*) A few days later, White told Stevers to take some time off while human resources looked into the matter. (Stevers Dep. 163.) White assigned Angelita Tolliver to investigate. (*See* Tolliver Decl. ¶ 6.) He also told Tolliver "that others had reached out to him previously with issues regarding Mr. Stevers" and that he had heard "Stevers had used aggressive language with certain

[employees], including Bill Stone." (*Id.*) Tolliver conducted a series of interviews, and learned the following:

- Shepard said that "Stevers was aggressive during their encounter on July 14, berating him and barking like a dog." Stevers also "demanded that Mr. Shepard get out of a Company truck, threatened him with a drug test, and threatened to call the police." Stevers had previously "been browbeating and hostile towards" Shepard, and "employees scatter from the shop" when Stevers is around. Stevers also yelled at Stone during a sales meeting. (*Id.* ¶ 8.)
- Bohnett said that Stevers had yelled at Shepard and threatened to call the police or order a drug test. Bohnett had previously observed "Stevers yelling at another employee, yelling at a front desk person . . . and yelling at a supplier of plastic pallets." (*Id.* ¶ 9.)
- McCoy said that Stevers's allegedly hostile conduct "sounded typical" and that Stevers was often "aggressive" towards employees and vendors. In one instance, "Stevers yelled at a supplier over a late order, after which Mr. McCoy had to call the supplier to apologize, and the supplier notified Mr. McCoy that it would no longer contact Mr. Stevers because he did not know how to talk professionally." McCoy also recounted "an incident where Mr. Stevers yelled at hotel staff while checking into a hotel, and the hotel would not consider working with Groundworks in the future based on the way Mr. Stevers spoke to them." (*Id.* ¶ 10.) Tolliver asked McCoy whether he thought "coaching or training would fix Mr. Stevers's behavioral issues," and McCoy said he did not think so because Stevers's "conduct had been long term and set in stone." (*Id.* ¶ 11.)

- Branch Manager Theresa Grist said that "Stevers was pretty volatile when challenged," and "that she had witnessed Mr. Stevers slamming his cell phone onto a desk," "cursing people out on the phone," and yelling at employees, including her and Stone. Grist noted that various employees had complained to her about Stevers. (*Id.* ¶ 12.)

Tolliver also watched a video that Bohnett had recorded during the July 14 incident, which captured a portion of Stevers's conversation with Shepard. The video begins with Stevers asking Shepard, "Do I gotta call the police on you?" (July 14 Video 00:03, Ex. B-7.) Shepard responds, "For what?" (*Id.* at 00:04.) Stevers replies, "For being disruptive and not listening to your boss. I'm asking you to leave your vehicle." (*Id.* at 00:05–00:09.) Shepard interrupts, "You're not asking me, you're ordering me," and accuses Stevers of yelling at him. (*Id.* at 00:09–00:14.) Stevers says, "You're off the clock and you're just sitting there, I'm not going to argue with you, I'm done arguing with you. Exit the company vehicle." (*Id.* at 00:11–00:18.) Shepard tells Stevers to "stop screaming at me," and Stevers says he is not screaming. (*Id.* at 00:29–00:31.) Bohnett interjects that the video will confirm Stevers is yelling, and that he "came over here yelling." (*Id.* at 00:35–00:47.) Stevers repeats that he is not yelling. (*Id.* at 00:48.) Stevers's voice is raised for much of this conversation, though not loud enough that the Court would characterize it as "yelling" or "screaming."

Tolliver, upon reviewing the video, concluded that it "confirmed the claim that Mr. Stevers had shouted, yelled," "threaten[ed] Mr. Shepard," "and used aggressive behavior towards other employees." (Tolliver Decl. ¶ 13.) Because Tolliver believed that the video corroborated Shepard and Bohnett's version of events, she found it unnecessary to interview Stevers. (*Id.* ¶¶ 14–15.) Tolliver found that Stevers had committed two "Level 4" violations, which require termination

according to company policy. These violations were "conduct which brings disrepute on the company" and "misuse of authority." (*Id.* ¶ 22 (cleaned up).) Tolliver recommended to White that Stevers be terminated. (*Id.* ¶ 16.)

Upon receiving Tolliver's report, White agreed that Stevers should be terminated. He was not concerned that Stevers had not been interviewed during the investigation "because there was video of Mr. Stevers's yelling, which substantiated Mr. Shepard's complaint against Mr. Stevers." (White Decl. ¶ 16.) On July 22, White called Stevers and informed him he had been terminated for "gross misconduct." (Stevers Dep. 172.) Tolliver was also on the call, and (according to Stevers) said that she had "heard several complaints" about Stevers and had "been watching [him] for a few months . . . just waiting for an incident." (*Id.*)

Stevers contends that his termination was due to his age. He testified that McCoy "always would refer to [Stevers] as like an old timer, old school," because Stevers has "been in the trades for a long time and there are things that we do and we say that a lot of people, they don't understand." (*Id.* at 200.) McCoy told Stevers several times that he did not "understand the younger generation" because Stevers was exasperated that so many employees were not showing up to work on time. (*Id.* at 201–02.) Stevers also sometimes overheard McCoy or others talking about the "old man," which he interpreted as a reference to himself because there were no other employees around his age in the office. (*Id.* at 204–05.) McCoy denied calling Stevers old-fashioned or saying that he did not understand young people, but he testified that Stevers "had a mentality of kind of an older style of it's my way or the highway." (McCoy Dep. 30, ECF No. 35-3.)

After Stevers was terminated, Groundworks promoted Bill Stone to the position of general manager at the Traverse City office. (*See* White Dep. 101, ECF No. 34-10.) White testified that

Stone was not Stevers's replacement because an operations manager and general manager have different duties, and Groundworks never filled the operating manager position after Stevers left. (*Id.* at 101–02.) However, McCoy testified that Stevers and Stone held essentially the same position. (McCoy Dep. 15–16.) Stone was in his mid-thirties or forties at the time. (*See id.* at 16; Stevers Dep. 233.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (alteration in original) (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020)). "[W]hen the moving party bears the burden of proof [at trial], their initial summary judgment burden is higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (cleaned up). When the moving party does not bear the burden of proof at trial, they may meet their initial burden at

summary judgment by “submitting affirmative evidence that negates an essential element of the nonmoving party’s claim,” *Kava v. Peters*, 450 F. App’x 470, 473 (6th Cir. 2011) (cleaned up), or by “pointing out the lack of evidence to support an essential element” of that claim, *Rockwood Auto Parts, Inc. v. Monroe County*, 155 F.4th 557, 566 (6th Cir. 2025) (cleaned up). The nonmovant must then present “sufficient evidence from which a jury could reasonably find in [their] favor.” *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (cleaned up).

## III. ANALYSIS

Stevers brings claims under the ADEA and the ELCRA, which both prohibit age discrimination in employment. *See* 29 U.S.C. § 623; Mich. Comp. Laws §§ 37.2201–2202. Claims under these two statutes are subject to the same legal standard. *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009). As set out below, the Court finds that (1) Stevers has properly exhausted his administrative remedies, and (2) Stevers has established a prima facie case of age discrimination, but (3) Stevers has not provided evidence establishing that Groundworks’ proffered nondiscriminatory reason for his termination was pretextual. Accordingly, the Court will grant summary judgment to Groundworks.

### A. Exhaustion

As a preliminary matter, Groundworks contends that Stevers did not exhaust his administrative remedies with the Equal Employment Opportunity Commission (EEOC) as to portions of his claim. Before filing an ADEA suit in federal court, a plaintiff must file a charge of discrimination with the EEOC containing “a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.” *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998) (quoting 29 C.F.R. § 1601.12(b) (2026)). “[B]ecause aggrieved employees typically file charges with the EEOC pro se, their complaints are construed liberally so that courts may also consider claims that are reasonably

related to or grow out of the factual allegations in the EEOC charge." *Barrow v. City of Cleveland*, 773 F. App'x 254, 260 (6th Cir. 2019) (internal quotation marks omitted).

Groundworks does not dispute that Stevers raised an age discrimination claim before the EEOC (*see* Charge of Discrimination, ECF No. 35-16), but it notes that his claim relies in part on evidence not provided to the EEOC—namely, that McCoy made derogatory comments about his age. However, those comments are related to the allegations of age discrimination in the EEOC complaint, as they are merely additional evidence going to Groundworks' reasons for terminating Stevers. Stevers is not attempting to raise a separate hostile work environment claim based on McCoy's comments. Groundworks does not cite any cases holding that a plaintiff must mention in their EEOC complaint all evidence they intend to use in a later lawsuit. Instead, the case law focuses on whether a plaintiff has exhausted a particular *claim*—and Stevers plainly raised an age discrimination claim regarding his termination before the EEOC. Thus, Groundworks' exhaustion argument fails.

**B. Prima Facie Case**

Stevers contends that Groundworks terminated him based on his age. An employer's discriminatory motive may be established by either direct or circumstantial evidence. *See Geiger*, 579 F.3d at 620–22. Stevers relies on circumstantial evidence, so the Court applies the *McDonnell Douglas* burden-shifting framework. *See id.* at 622. Under that framework, the plaintiff has the burden of establishing the four elements of a prima facie case: "1) that [the plaintiff] was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class" or someone significantly younger than him. *Id.*; *see Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 727 (6th Cir. 2007).

"Once a plaintiff satisfies [his] *prima facie* burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action."

*Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010). If the employer provides a nondiscriminatory reason, "the burden of production shifts back to the plaintiff to show that the employer's explanation was a mere pretext for intentional age discrimination." *Id.* Although the burden of production shifts, "[t]he burden of persuasion . . . remains on the ADEA plaintiff at all times to demonstrate that age was the 'but-for' cause of their employer's adverse action." *Id.* (internal quotation marks omitted). Because the ADEA requires but-for causation, it is not enough for the plaintiff to merely show "that age was one motivating factor in [the employer's] decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009); *see also Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 512 (Mich. 2022) (applying but-for standard to ELCRA). "The condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employer[']s only consideration, but rather that the adverse employment action *would not have occurred without it*." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (cleaned up).

The parties do not dispute that Stevers is a member of a protected class and was discharged. As to the third element of a prima facie case, Groundworks argues that Stevers was not qualified for his job due to his mistreatment of employees. But Stevers's treatment of employees is also Groundworks' proffered nondiscriminatory reason for terminating him, and the Court cannot consider an employer's proffered reason for termination when analyzing the plaintiff's prima facie case. *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) (noting that it is "inappropriate for the district court . . . to rely on the nondiscriminatory reason for termination to find plaintiff's prima facie case inadequate"); *see also Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (applying *Cline* to ELCRA claim). This rule applies even if the employer's nondiscriminatory reason is "that, in the employer's view, the plaintiff was not meeting

its legitimate expectations for the position at issue." *Cline,* 206 F.3d at 661. Because the parties do not dispute that Stevers was otherwise qualified for his job—putting aside his treatment of subordinates—he has established the third element of his prima facie case.

As to the fourth element, Stevers claims that he was replaced by Stone, who was around 15 and 25 years younger than him.[2] Groundworks argues that Stone was not Stevers's replacement because Stone's position of general manager was different from Stevers's position of operations manager. However, a difference in formal title does not preclude a finding that an employee was replaced. *See Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 n.10 (6th Cir. 1990) ("Of course an employer could not avoid liability by changing the job title or by making minor changes to a job indicative of an attempt to avoid liability."). McCoy testified that Stevers and Stone had essentially the same role, which is enough to create a genuine dispute of fact. Groundworks contends that McCoy's testimony is not based on personal knowledge, but anyone working at the Traverse City office likely has personal knowledge of the duties of the office's manager. And as a matter of common sense, two people who run the same office presumably have many of the same duties, regardless of what their position is called. Thus, Stevers has established all the elements of a prima facie case.

### C. Nondiscriminatory Explanation

Groundworks has proffered a nondiscriminatory explanation for Stevers's termination: his poor treatment of employees under his supervision. Stevers contends that this explanation is

[2] Groundworks contends that Stevers's prima facie case fails because he does not identify Stone's age in his opposition brief. (Def.'s Reply Br. 3, ECF No. 36.) But Stevers cites McCoy's statement that Stone was 46 or 48 in 2026 (Pl.'s Resp. Br. 11, ECF No. 45), which would make him 42 or 44 when Stevers was terminated. Stevers testified that he thought Stone was in his mid-30s in 2026. (Stevers Dep. 233.) Regardless of who is correct, Stone was at least 15 years younger than Stevers, which qualifies as a significant age difference for purposes of a prima facie case. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 284 (6th Cir. 2012) (noting that age differences of 10 years or more are generally considered significant).

pretextual, for several reasons. First, Stevers argues that McCoy's frequent comments about Stevers's age reveal an underlying discriminatory basis for the termination decision. Groundworks responds that McCoy was not responsible for Stevers's termination, so any alleged bias on his part is irrelevant. Stevers counters that McCoy's motivations may create liability for Groundworks under a "cat's paw" theory, which applies when "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker . . . as a dupe in a deliberate scheme to trigger a discriminatory employment action." *DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101, 105 (6th Cir. 2015). Stevers argues that McCoy lied to Tolliver for discriminatory reasons and caused Stevers to be terminated.[3]

However, Stevers is unable to make out a cat's paw theory. Cat's paw liability does not attach when the decisionmaker "conducts an in-depth and truly independent investigation" "that results in an adverse action for reasons *unrelated* to the . . . original biased action." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017) (internal quotation marks omitted). The Court assumes for purposes of this analysis that McCoy's comments to Stevers imply discriminatory animus. Nevertheless, Stevers has failed to show that McCoy caused his termination. Although some of Tolliver's information came from McCoy, Tolliver also spoke to Shepard, Bonnett, and Grist, and watched the video of the incident. Additionally, Tolliver heard from Weeden that Irvine and others had reported Stevers's prior misbehavior, and White heard Shepard's and Grist's prior complaints about Stevers. There is no reason to think that if not for McCoy's report to Tolliver, Stevers would not have been terminated. Instead, the evidence

[3] Michigan courts have left open the question of whether a cat's paw theory exists under state law. *See Jewett v. Mesick Consol. Sch. Dist.*, 957 N.W.2d 377, 385 (Mich. Ct. App. 2020); *Damghani v. Pepsico, Inc.*, No. 321276, 2015 WL 5314393, at *3 (Mich. Ct. App. Sep. 10, 2015). Because the Court finds that Stevers has not established liability under a cat's paw theory, it need not address this issue.

suggests that White and Tolliver were primarily concerned about the July 14 incident, which they learned about entirely through sources other than McCoy. Because McCoy did not cause Stevers's termination, it is irrelevant whether he had a discriminatory motivation.[4]

Second, Stevers argues that Tolliver's failure to interview him reveals that the investigation was a sham. But the Court disagrees. Tolliver and White were both aware of prior incidents in which Stevers had allegedly acted aggressively, and Tolliver heard from multiple witnesses who confirmed this fact. She also heard both Shepard and Bohnett's account of the July 14 incident and watched the video. At that point, it was reasonable for her to conclude that these witnesses were being honest, and hearing Stevers (presumably) deny their allegations would have been pointless. This is especially true as to the video, which contains indisputable evidence supporting Shepard and Bohnett's account. It is true that the video only contains a portion of the conversation, and that (in the Court's view) Stevers is not truly "yelling" in it. But the video corroborates the allegation that Stevers raised his voice and threatened to call the police. It was not unreasonable for Tolliver and White to stop their investigation there. Although Stevers may disagree with the wisdom of that decision, "an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020) (internal quotation marks omitted).

Finally, Stevers cites as evidence of pretext Tolliver's statement that she had "heard several complaints" about Stevers and had "been watching [him] for a few months . . . just waiting for an

---

[4] In Stevers's testimony, he suggested that Grist also had a discriminatory motive because she once called him a "Boomer," which he interpreted as an age-related insult. (Stevers Dep. 206.) Even if Stevers argued that Grist caused his termination under a cat's paw theory—which he does not—that argument would fail for the same reason as his argument regarding McCoy: Tolliver and White had plenty of other evidence on which to base their decision beyond McCoy and Grist's claims about Stevers's behavior.

incident." (Stevers Dep. 172.) But this statement does not imply that Tolliver harbored discriminatory animus against Stevers and was looking for a reason to fire him. Rather, it suggests that Tolliver knew of Stevers's past behavior and thought another incident might occur that would cause him to be fired. There is nothing discriminatory or suspicious about a human resources employee anticipating that a manager who allegedly mistreats his employees may eventually have to be discharged.

## IV. CONCLUSION

In sum, Stevers has not established that a reasonable jury could disbelieve Groundworks' nondiscriminatory explanation for his termination. Thus, the Court will grant Groundworks' motion for summary judgment and dismiss the case. An order and judgment will enter in accordance with this Opinion.

Dated: October 2, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE